# In the United States Court of Federal Claims

No. 07-125 C
(Filed Under Seal: March 19, 2007)
(Reissued: April 2, 2007)[1]

| | | |
|---|---|---|
| PROTECTION STRATEGIES, INCORPORATED, Plaintiff, | | Post-Award Bid Protest; Motion for Preliminary Injunction; Declarations; Live Testimony; Hearsay; Bait and Switch; National Security |
| v. | | |
| THE UNITED STATES, Defendant. | | |

Cyrus E. Phillips, IV, Washington, DC, for plaintiff.

William P. Rayel, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

This post-award bid protest concerns the procurement of Security System Services for the National Nuclear Security Administration's ("NNSA") Nevada Site Office and Nevada Test Site. Protection Strategies, Incorporated ("plaintiff"), an unsuccessful bidder, alleges that the NNSA improperly awarded the contract to a competing bidder who could not supply the required personnel as promised. Presently before the court are Plaintiff's Motion for a Preliminary Injunction ("plaintiff's motion" or "Pl.'s Mot."), Defendant's Motion to Strike Certain Attachments to Plaintiff's Brief in Support of Plaintiff's Motion for a Preliminary Injunction ("motion to strike"), and Defendant's Motion for Reconsideration and Objection to the Court's March 15, 2007 Order ("motion for reconsideration"). Plaintiff's motion sought to preclude the NNSA from proceeding with the entire Security System Services contract. However, at oral argument, plaintiff amended its request for preliminary injunctive relief to encompass only those functions performed by the Vulnerability Assessment Manager and the Site Safeguards and Security Plan Manager. Transcript of March 16, 2007 Proceedings ("Tr. II") at 73-74. As

[1] The court issued this Opinion and Order under seal on March 19, 2007. The court directed the parties to submit proposed redactions by March 30, 2007. Only the defendant filed proposed redactions, and the court has incorporated these redactions, indicated by brackets, into this reissued Opinion and Order.

explained below, plaintiff has failed to meet its burden to show that injunctive relief is appropriate in this case. Accordingly, plaintiff's motion is denied. Further, the court grants defendant's motion to strike and denies as moot defendant's motion for reconsideration.

## I. BACKGROUND

### A. Solicitation and Award[2]

On April 18, 2005, the NNSA, a component of the United States Department of Energy, issued Solicitation number DE-RP52-05NA99344 ("the solicitation"), seeking Competitive Proposals for a contract to provide Security System Services for the Nevada Site Office and the Nevada Test Site. Pl.'s Ex. 3 at 3. The Nevada Test Site is "a 1,375 square-mile federal reservation located approximately 65 miles northwest of Las Vegas, Nevada . . . operated and controlled by the NNSA/[Nevada Site Office]." Id. at 2. The facility:

> provides the supporting infrastructure, air space and utilities to serve the nation in developing innovative solutions to complex problems involving special nuclear material (SNM); hazardous materials; and multi-agency, integrated operations. The [Nevada Test Site] represents the United States' single, unique capability to support nuclear testing and major experiments that involve SNM or hazardous materials.

Id. This invitation to bid presented a new contract set aside for small businesses. Id. at 3. The incumbent provider of Security System Services was "a large business security support services contractor." Compl. ¶ 5. The solicitation indicated that the contract would be for a term of approximately three years, and would begin with an approximately three-week transition period. Pl.'s Ex. 6 at 2. The successful bidder was responsible for the "full performance of the Nevada Site Office Security System Services" upon the expiration of the transition period. Id.

The contract described by the solicitation required Security System Services in eight main areas: (1) performance of Vulnerability Assessments; (2) provision of Operational Security support; (3) preparation of Site Safeguards and Security Plans; (4) provision of Security Classification administrative support; (5) provision of physical fitness training for the guard force; (6) provision of Classified Matter staffing and administrative support; (7) operation of the pass and badge system; and (8) delivery of other security support services, such as operating an intranet website, providing security briefings, preparing security education and awareness

---

[2] For the purposes of ruling on plaintiff's motion for a preliminary injunction, the factual background was taken from the Complaint ("Compl."), certain exhibits attached to Plaintiff's Brief in Support of Plaintiff's Motion for a Preliminary Injunction ("Pl.'s Ex. __ at __"), and certain exhibits attached to Defendant's Opposition to Plaintiff's Motion for a Preliminary Injunction ("Def.'s Ex. __ at __"). Because the parties did not separately number the pages of the exhibits to their briefs, the court will refer to them with the page numbers assigned by the court's electronic case management system.

materials, maintaining and updating security education and training records, and providing Safeguards and Security professional training. Pl.'s Ex. 7 at 2-5.

The NNSA estimated that 33 full-time personnel were required to perform the described Security System Services. Pl.'s Ex. 4 at 2. These personnel included a Program Manager; three individuals to perform Vulnerability Assessments; nine people to provide Operational Security, Security Classification administrative support, Classified Matter staffing and administrative support, and other security support; three individuals to support the preparation, review, and revision of the Site Safeguards and Security Plan; twelve individuals to provide physical fitness training; and five individuals to operate the pass and badge systems. Id.

The solicitation required bidders to identify four Key Persons in the Technical Proposal portion of their Competitive Proposals: a Program Manager, a Vulnerability Assessments Manager, an Operational Security Manager, and a Site Safeguards and Security Plan Manager. Pl.'s Ex. 5 at 2; Pl.'s Ex. 8 at 2-3. Each bidder's Competitive Proposal was to include the following information about the Key Personnel:

> The Offeror's proposal shall demonstrate that its proposed key personnel for this contract are highly qualified, and demonstrate the ability to effectively manage a program of the nature, size and scope of the work required in the [Statement of Work]. The Offeror's key personnel will be evaluated on their qualifications, currency and relevancy of experience, attainment of advanced degrees in related disciplines, and demonstrated technical expertise, in the specific positions for which they are proposed. Currency and relevancy of experience is significantly more important than education. The Program Manager is considered significantly more important and will be given more weight in the evaluation than any other key personnel. The availability and commitment of each of the Offeror's key personnel to accept employment in the positions proposed (at an agreed upon salary and benefits package) must be demonstrated by submitting signed and dated letters of commitment, and resumes demonstrating how the proposed personnel meet the experience and qualifications specified. Failure to submit such resumes and letters of commitment may result in an unsatisfactory rating.

Pl.'s Ex. 8 at 3; see also Pl.'s Ex. 9 at 2. Further, bidders were required to describe their "plan for retaining proposed Key Personnel." Pl.'s Ex. 8 at 3. In addition, in the solicitation's Statement of Work, the NNSA indicated that vulnerability assessments, operational security functions, and the drafting of the site safeguards and security plan were to be performed by "Q-cleared" personnel. Pl.'s Ex. 7 at 2-3. The solicitation did not specify that the Key Personnel were required to perform their responsibilities on site. See, e.g., Def.'s Ex. 1 at 2-4, 11, 13-14 (describing the duties and importance of the Key Personnel but not indicating where those duties were to be performed).

Bidders were also required to describe their technical capabilities in their Technical Proposals. Pl.'s Ex. 8 at 3. The NNSA would evaluate each Competitive Proposal for the bidder's "ability to provide a highly trained professional nucleus of employees who possess the

necessary skills and flexibility to perform the [Statement of Work]" and for the extent and strength "of the Offeror's corporate experience in performing all aspects of the" work required by the contract. Id. The NNSA would also evaluate each bidder's proposed transition plan as part of the bidder's technical capabilities. Id.

The final portion of each Technical Proposal was to contain past performance information for contracts completed or in process within the last five years where the work was relevant to the contract described in the solicitation. Id.

Bidders were required to submit Competitive Proposals to the NNSA by July 7, 2005. Pl.'s Ex. 3 at 3. Plaintiff, a service-disabled veteran-owned small business that describes itself as a "diversified security support services company," submitted a Competitive Proposal. See Pl.'s Ex. 10. Plaintiff's Competitive Proposal described its qualifications for the contract and referred to its prior experience with the Department of Energy. Id. at 2, 5-6. Further, plaintiff noted that it held Department of Energy Q and Department of Defense Top Secret facility clearances, that all of its technical personnel held Q or Top Secret clearances and had prior military or law enforcement experience, and that all of its specialists were seasoned person within the Department of Energy, the Department of State, the Department of Defense, and the intelligence community. Id. at 6.

The NNSA established a Competitive Range for the solicitation in September 2006. See Pl.'s Ex. 3 at 3 (indicating that the Source Selection Authority "reviewed the [Source Evaluation Board]'s Competitive Range Report and was subsequently briefed by the Contracting Officer on September 22, 2006"). In the time period between its receipt of the Competitive Proposals and its establishment of the Competitive Range, the NNSA tasked plaintiff with writing a Site Safeguards and Security Plan for the Nevada Site Office completing a baseline Vulnerability Assessment for the Nevada Test Site Device Assembly Facility. Pl.'s Ex. 14 at 20; Compl. ¶ 12.

While plaintiff was performing that work for the NNSA, it learned that it had been included within in the Competitive Range that was established in September 2006. Pl.'s Ex. 3 at 4; Pl.'s Ex. 4 at 2. Subsequently, the NNSA set October 6, 2006, as the deadline for Revised Competitive Proposals. Pl.'s Ex. 3 at 3. Plaintiff's Revised Competitive Proposal noted that it had prepared a Site Safeguards and Security Plan and Vulnerability Assessments during the delay in awarding the contract. Compl. ¶ 12. The NNSA then issued additional questions to the bidders on November 2, 2006. Pl.'s Ex. 3 at 3; Pl.'s Ex. 4 at 2. Final Competitive Proposals were due to the NNSA on November 9, 2006. Pl.'s Ex. 3 at 3; Pl.'s Ex. 4 at 2.

The NNSA indicated that the Source Evaluation Board would evaluate the Competitive Proposals based on the following four criteria, in descending order of importance: Key Personnel, Technical Capability, Past Performance, and Cost. See Pl.'s Ex. 3 at 4 (providing the following weights: 45 points for Key Personnel, 40 points for Technical Capability, and 15 points for Past Performance). The first three criteria were to be rated adjectively and were significantly more important than Cost criteria. Def.'s Ex. 1 at 11.

On December 6, 2006, after evaluating the Competitive Proposals within the Competitive Range, the NNSA notified plaintiff that the contract described in the solicitation had been awarded to PAI Corporation,[3] at a price of $22,088,411. Pl.'s Ex. 14 at 2-3. The NNSA attached the Source Evaluation Board's evaluation of plaintiff's Competitive Proposal to the award notification letter. Id. at 4-23. The evaluation indicated that plaintiff received the following ratings: "Significant Strength" for its proposed Program Manager; "Strength" for its proposed Vulnerability Assessment, Operational Security, and Site Safeguards and Security Plan Managers; "Excellent" for its Technical Capability; and "Excellent" for its Past Performance. Id. at 4. In contrast, according to the Source Selection Statement prepared by the NNSA's Source Selection Authority, Debby C. Miller, PAI Corporation received the following ratings: [ ] for its proposed Program, Vulnerability Assessment, and Site Safeguards and Security Plan Managers; [ ] for its proposed Operational Security Manager; [ ] for its Technical Capability; and [ ] for its Past Performance. Def.'s Ex. 1 at 65. The NNSA gave plaintiff's Competitive Proposal an overall score of 90.50, while PAI Corporation's overall score was 90.20. Id. at 64.

In her Source Selection Statement, Ms. Miller explained that she "could not find one Offeror as clearly standing above another Offeror," found the technical proposals of the bidders as "essentially equivalent," and concluded that the Competitive Proposal of PAI Corporation represented "the best value to the Government." Pl.'s Ex. 3 at 7-8. Ms. Miller noted that she "did not want to make an award at a price premium [she] considered disproportionate to the benefits associated with a [ ] higher technical score," and that plaintiff's "[ ] is not worth the additional [ ]" in overall contract costs. Def.'s Ex. 1 at 68.

Plaintiff received an oral debriefing pursuant to 41 U.S.C. § 253b(e)(1) (2000) on January 30, 2007. Compl. ¶ 4.

### B. Plaintiff's Allegations[4]

Plaintiff alleges that PAI Corporation has not yet delivered any of the four Key Persons identified in its Competitive Proposal. Compl. ¶ 16. First, plaintiff claims that PAI Corporation knew that it would not be able to deliver its proposed Project Manager, Kevin Klingenberg, if it was the successful bidder. Pl.'s Br. 8-9. Plaintiff also contends that PAI Corporation's replacement Program Manager was named after the award of the contract, and that individual assumed his responsibilities two weeks after the contract period began. Compl. ¶ 16.

Second, plaintiff alleges that PAI Corporation's proposed Vulnerability Assessment Manager, Robert Weatherby, and Site Safeguards and Security Plan Manager, Russell McKnight,

---

[3] PAI Corporation has not intervened in this action. However, the government has adopted PAI Corporation's position in its entirety.

[4] These allegations are taken from the Complaint, Plaintiff's Brief in Support of Plaintiff's Motion for a Preliminary Injunction ("Pl.'s Br."), and the Transcript of the March 16, 2007 Proceedings.

were not performing under the contract as promised by PAI Corporation. Id. ¶ 14; Pl.'s Br. 9, 11; Tr. II at 73. Plaintiff further contends that PAI Corporation may take up to a year before it can deliver a Vulnerability Assessment Manager. Compl. ¶ 16. Additionally, plaintiff contends that because PAI Corporation has not provided personnel with Q clearances, PAI Corporation has been unable to assume responsibility for the management of the Vulnerability Assessments Laboratory. Id.

In addition to the alleged failure of PAI Corporation to supply the required Key Personnel, plaintiff contends:

> PAI has initiated an inventory of accountable documents; however, this inventory has not been completed. Until this inventory has been completed and custody of the accountable documents transferred to PAI, the initial survey of the Contract as required by [Department of Energy] Directives cannot be conducted. Additionally, the incumbent large business security support services Contractor for the Nevada Test Site must be surveyed to assure all functions and classified material has been properly accounted-for and transferred to PAI.

Id. Plaintiff's final contention is that PAI Corporation had no past performances as a prime contractor delivering Security System Services to the Department of Energy. Id. ¶ 13.

### C. Defendant's Response[5]

Defendant denies plaintiff's allegations that PAI Corporation knew, at the time it submitted its Competitive Proposal, that Mr. Klingenberg would not be able to serve as Project Manager. Def.'s Br. 5-6. Defendant also asserts, contrary to plaintiff's claims, that PAI Corporation delivered the remaining three Key Persons identified in its Competitive Proposal. Id. at 6. Finally, defendant maintains that an award of preliminary injunctive relief would cause severe harm to the government. Id. at 17.

### D. Procedural History

Plaintiff filed a bid protest complaint and a motion for a preliminary injunction on February 26, 2007. In its complaint, plaintiff seeks the following relief: (1) a declaration that the contact award to PAI Corporation "lacks a rational basis and is unreasonable or irrational, and thus arbitrary and capricious"; (2) a declaration that PAI corporation is ineligible for a contract award under the solicitation; (3) a permanent injunction that terminates the contract award to PAI Corporation and reopens the solicitation to bidders already within the Competitive Range; and (4) a declaration that plaintiff is entitled to equitable relief and money damages for the Department of Energy's "breach of the implied-in-fact Contract of good faith, fair dealing, and honest consideration" with respect to the competition begun by the solicitation. Compl. Prayer

---

[5] Defendant's response is taken from the Defendant's Opposition to Plaintiff's Motion for a Preliminary Injunction ("Def.'s Br.").

for Relief ¶¶ 1-4. In its motion for a preliminary injunction, plaintiff seeks to enjoin the NNSA from proceeding with the contract awarded to PAI Corporation via the solicitation. Pl.'s Mot.1-2.

The court held a scheduling conference pursuant to Appendix C of the Rules of the United States Court of Federal Claims ("RCFC") on February 27, 2007. During the scheduling conference, plaintiff's counsel indicated that plaintiff wanted the court to proceed with its consideration of its motion for a preliminary injunction, explaining:

> The solicitation, and the statement of work, both require current Q clearances. That's what the solicitation requires.
>
> This is indeed work on the Nevada test site.
>
> It requires Q-cleared personnel. [PAI Corporation] has not delivered any of the people [it] promised to deliver. This is a security risk. It needs to be addressed, and it needs to be addressed and not sit around for three or four weeks until we can get in briefs on cross-motions.

Transcript of Feb. 27, 2007 Scheduling Conference at 12. Accordingly, the court directed the parties to file briefs and scheduled oral argument.

Plaintiff filed its brief on March 7, 2007, and defendant filed its brief on March 14, 2007. Both parties sought to supplement the record with multiple declarations to support their arguments. However, some of the declarations contained contradictory allegations, thus raising issues of fact. In a March 15, 2007 order, the court strongly recommended that the parties produce the following declarants to testify at the preliminary injunction hearing: Keith Hedman, Kevin Klingenberg, and Doan Phung.[6] The court did not direct either party to produce specific witnesses. The next day, March 16, 2007, the court heard testimony and argument.

### E. Testimony[7]

Plaintiff called Keith Hedman, plaintiff's president and chief executive officer, and Bruce Rogers, plaintiff's proposed Project Manager, to testify. Their declarations were filed previously with plaintiff's brief. Mr. Hedman's declaration relayed the contents of a February 28, 2007

---

[6] As noted above, defendant filed a motion for reconsideration with respect to the court's order. Because plaintiff excluded the Project Manager position from its request for preliminary injunctive relief, the court finds defendant's motion for reconsideration to be moot with respect to Mr. Klingenberg. Further, as described in the next section, both Mr. Hedman and Dr. Phung testified at the hearing. Thus, defendant's motion for reconsideration is also moot with respect to Mr. Hedman and Dr. Phung.

[7] See infra Section III.A.

conversation with PAI Corporation's proposed Project Manager, Mr. Klingenberg. In its motion to strike, defendant asserted that the court could not consider Mr. Hedman's declaration because its entire contents were hearsay. Defendant is correct; the entirety of Mr. Hedman's declaration is stricken pursuant to Rule 801 of the Federal Rules of Evidence. Similarly, defendant objected to any testimony at the March 16, 2007 hearing by Mr. Hedman regarding his conversation with Mr. Klingenberg. Tr. II at 12. Plaintiff conceded that the proposed testimony was hearsay, but was unable to cite an applicable exception to the hearsay rule. Id. at 12-14. Thus, the court sustained defendant's hearsay objection.[8] Id. at 14. Mr. Hedman's remaining testimony concerned the need for Vulnerability Assessments to be performed on site and how plaintiff could be ready to perform the Security System Services contract as soon as the following week. Id. at 16-20. As demonstrated below, Mr. Hedman's testimony was not necessary to the court's determination of the limited issue before it.

Mr. Rogers's declaration advanced certain allegations about Mr. Klingenberg, as well as PAI Corporation's proposed Vulnerability Assessment Manager, Robert Weatherby, and proposed Site Safeguards and Security Plan Manager, Russell McKnight. In its motion to strike, defendant asserted that the court could not consider these allegations contained in Mr. Rogers's declaration because they were hearsay. Again, defendant is correct; the court strikes the allegations from Mr. Rogers's declaration identified with the dates December 6, 2006, through and including February 27, 2007.[9] Mr. Rogers testified concerning plaintiff's assistance to PAI Corporation during the transition period. Id. at 23-24. Like the testimony of Mr. Hedman, the court need not consider the testimony of Mr. Rogers to decide the limited issue before it.

Dr. Phung then testified via video conference from Las Vegas, Nevada. His testimony did not depart from the contents of his declaration, which focused on Mr. Klingenberg's availability to assume the position of Project Manager. See id. at 26-48. Because plaintiff chose not to press a challenge to the Project Manager position in its request for preliminary injunctive relief, id. at 73-74, the court need not address Dr. Phung's credibility with respect to this issue.[10]

The final witness at hearing was Patricia Bodin, the Acting Deputy Assistant Manager for Safeguards and Security at the Nevada Site Office. Ms. Bodin also appeared by video conference from Las Vegas, Nevada. In its opposition to plaintiff's motion, defendant had submitted a

---

[8] Furthermore, because plaintiff narrowed the scope of its request for preliminary injunctive relief to the positions of Vulnerability Assessment Manager and Site Safeguards and Security Plan Manager, any allegations concerning PAI Corporation's Project Manager are irrelevant to this proceeding.

[9] The remaining allegations in Mr. Rogers's declaration refer to facts that also are contained in the administrative record. These remaining allegations are likewise stricken.

[10] Similarly, the court does not consider those portions of Dr. Phung's declaration, submitted by defendant, that concern the Project Manager position and his dealings with Mr. Klingenberg.

declaration from Ms. Bodin, which contained the following assertion about the Key Persons named in PAI Corporation's proposal:

> Three out of the four Key Persons identified in PAI's proposal assumed their positions on December 7, 2006: (a) Robert J. Weatherby assumed the role of [Vulnerability Assessment] Section Head; (b) Kurt W. Haase assumed the role of [Operational Security] Section Head; and (c) Russell McKnight assumed the role of [Site Safeguard and Security Plan] Section Head. All three are currently serving in these positions. While Mr. McKnight and Mr. Weatherby are not currently in Las Vegas, neither the solicitation, nor the contract, requires them to be onsite.

Def.'s Ex. 4 at 3. Ms. Bodin confirmed these statements from her declaration in her March 16, 2007 testimony. Tr. II at 56-58, 63-64.

Of equal, if not greater, importance, in the court's view, were the statements in Ms. Bodin's declaration regarding the harm to national security that would result if the court granted plaintiff's motion for a preliminary injunction. Ms. Bodin stated that a preliminary injunction would "cause immediate and irreparable harm to the operation" of the Nevada Test Site and the Nevada Site Office because "[m]any of the security functions currently being performed by PAI are essential to the daily operation" of both sites. Def.'s Ex. 4 at 5. As one example, Ms. Bodin explained:

> Each day, several hundred visitors come and go from these sites, each of whom requires special badging. This includes visitors from [the Department of Energy]'s laboratories all over the country and vendors such as the United States Postal Service and Federal Express. If the badging operation were shut down, a substantial number of activities at the [Nevada Test Site] would come to a standstill because the [Nevada Test Site] cannot operate without proper security access control. The [Nevada Test Site] conducts high-hazard operations in support of national security missions. A shutdown of operations would affect time-sensitive national security operations for [the Department of Energy], NNSA, Department of Homeland Security, Department of Defense and other government agencies who rely on the ability of the [Nevada Test Site] to conduct their field work.

Id. Ms. Bodin also asserted that without PAI Corporation's contract services, the NNSA would not be able to (1) provide classified or sensitive information to program offices in Washington, DC, because it would be without "classification guidance support"; (2) begin new operations with special nuclear materials because of the backlog of fourteen necessary Vulnerability Assessments; or (3) provide continuing assessment regarding the use of appropriate security measures because it would not have an Operational Security program. Id. at 5-6. Finally, Ms. Bodin averred that "no one, including NNSA itself, is currently in a position to step in and assume all of PAI's responsibilities." Id. at 6. At the court's request, Ms. Bodin expanded upon the assertions regarding these national security implications from her declaration in her

testimony. Tr. II at 66-70. Ms. Bodin clarified that if PAI Corporation's performance on the contract were enjoined, the badge office would shut down, id. at 67, the NNSA would have "difficulty in properly identifying classified information," id. at 68, the NNSA would lose its ability to conduct ongoing security assessments, id. at 70, and that new initiatives involving special nuclear material could not be conducted, id. at 71. Ms. Bodin also implied that it could take an additional three months to transition to a new contractor. Id. at 68.

## II. LEGAL STANDARDS

### A. Jurisdiction

The United States Court of Federal Claims ("Court of Federal Claims") possesses jurisdiction over post-award bid protest cases pursuant to the Tucker Act, 28 U.S.C. § 1491(b) (2000).[11] Specifically, the Tucker Act provides, in relevant part, that the Court of Federal Claims "shall have jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). Further, the Tucker Act permits the Court of Federal Claims to "award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." Id. § 1491(b)(2).

### B. Preliminary Injunctions

Both the Tucker Act, 28 U.S.C. § 1491(b)(2), and RCFC 56 grant the Court of Federal Claims the authority to issue preliminary injunctions. Preliminary injunctive relief is an extraordinary and drastic remedy. Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam); FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993). In determining whether to grant a motion for a preliminary injunction, a court must consider whether (1) plaintiff is likely to succeed on the merits; (2) plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships favors the grant of injunctive relief; and (4) it is in the public interest to grant injunctive relief. U.S. Ass'n of Imps. of Textiles & Apparel v. United States, 413 F.3d 1344, 1346 (Fed. Cir. 2005); PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004). None of the four factors, taken individually, is dispositive, and a "weakness of the showing regarding one factor may be overborne by the strength of the others." FMC Corp., 3 F.3d at 427. Conversely, "the absence of any one factor may be sufficient" to deny preliminary injunctive relief. Id. The award of preliminary injunctive relief is within the discretion of the court. Id.

---

[11] Jurisdiction over post-award bid protest cases was added to the Tucker Act by section 12 of the Administrative Dispute Resolution Act of 1996. Pub. L. No. 104-320, 1110 Stat. 3870, 3874-76.

## III. DISCUSSION

### A. The Court May Consider Evidence Outside of the Administrative Record in Limited Circumstances

As a threshold matter, the court must determine what evidence it may consider in ruling on plaintiff's motion. Generally, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Camp v. Pitts, 411 U.S. 138, 142 (1973). However, a court may consider evidence outside of the administrative record in the following limited situations:

> (1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; . . . and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

Esch v. Yeutter, 876 F.2d 976, 991 (D.C. Cir. 1989) (citing Steven Stark & Sarah Wald, Setting No Records: The Failed Attempts to Limit the Record in Review of Administrative Action, 36 Admin. L. Rev. 333, 345 (1984)). The Court of Federal Claims frequently has adopted and applied these exceptions to the review of outside evidence. See, e.g., Myers Investigative & Sec. Servs., Inc. v. United States, 47 Fed. Cl. 288, 294 (2000); GraphicData, LLC v. United States, 37 Fed. Cl. 771, 779 (1997); Cubic Applications, Inc. v. United States, 37 Fed. Cl. 339, 342 (1997). Furthermore, the court is permitted to obtain such outside evidence via live testimony. See, e.g., Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1338-39 (Fed. Cir. 2001); Bannum, Inc. v. United States, 56 Fed. Cl. 453, 455 n.2 (2003).

At issue in this case is whether PAI Corporation delivered the Key Personnel promised in its Competitive Proposal. The administrative record would not, and cannot, contain this information because it does not contain any information about what occurred after the NNSA awarded the contract. Thus, the court must consider evidence from outside the administrative record.[12] Both parties submitted declarations that addressed PAI Corporation's delivery of Key Personnel. But, because the parties disagreed on essential, underlying facts, the court found the submitted declarations to be insufficient. Accordingly, the court heard, and will consider, the testimony proffered at hearing. The court now analyzes all of the evidence before it in light of the four elements it must consider in deciding whether to issue a preliminary injunction.

---

[12] The court notes that plaintiff has submitted certain evidence outside of the administrative record that does not pertain to PAI Corporation's delivery of Key Personnel upon the award of the contract. The court grants defendant's motion to strike with respect to exhibits 1, 2, 11, 12, 17, 18, 19, and 20.

**B. Plaintiff Has Not Shown a Likelihood of Success on the Merits**

Section 1491(b)(4) requires the Court of Federal Claims to review the agency's actions pursuant the standards provided in 5 U.S.C. § 706[13] ("APA standards"). The Court of Federal Claims may set aside a bid award under these APA standards "if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1332. On the first ground, the disappointed bidder bears the burden of showing that the contracting agency had no rational basis on which to make its award. Id. at 1332-33. On the second ground, "the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" Id. at 1333 (citation omitted). In addition to showing a "significant error in the procurement process," a disappointed bidder must also show that it was prejudiced by the error. Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996). To show prejudice, the disappointed bidder must demonstrate "that there was a substantial chance it would have received the contract award but for that error." Id. at 1582.

Plaintiff argues that the NNSA awarded the contract to PAI Corporation in violation of 41 U.S.C. § 253b(3), which requires the NNSA to award the contract to "the responsible source whose proposal is most advantageous to the United States, considering only cost or price and the other factors included in the solicitation." Pl.'s Mot. 5. A responsible source is "a prospective contractor who . . . is able to comply with the required or proposed delivery or performance schedule [and] . . . has the necessary organization, experience, accounting and operational controls, and the technical skills, or the ability to obtain such organization, experience, controls, and skills . . . ." 41 U.S.C. §§ 403(7)(B), (E). Plaintiff contends that PAI Corporation is not a responsible source because it did not deliver the four Key Persons it promised in its successful Competitive Proposal. Pl.'s Br. 11-12. Plaintiff asserts that the actions of PAI Corporation constituted an unlawful bait and switch. Id. at 11.

The crux of a bait and switch claim is the government's reliance on a misrepresentation by a successful bidder, which effectively changes the term or terms of the underlying solicitation.

---

[13] This section is part of the Administrative Procedure Act, Pub. L. No. 89-554, 80 Stat. 378 (1966), and provides, in relevant part:

> The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law. . . . In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706 (2000).

See generally Planning Research Corp. v. United States, 971 F.2d 736 (Fed. Cir. 1992) (affirming the conclusion of the General Services Board of Contract Appeals that the successful bidder's misrepresentation of the key personnel it intended to deliver upon contract award materially modified the contract requirements and denied all bidders a full and open competition). Based upon the ruling by the United States Court of Appeals for the Federal Circuit ("Federal Circuit") in Planning Research Corp., and like decisions of the Comptroller General, the Court of Federal Claims has summarized the essential elements of a bait and switch claim:

> To demonstrate a "bait and switch," a protestor must show that (1) the awardee represented in its proposal that it would rely on certain specified personnel in forming the service; (2) the agency relied on this representation in evaluating the proposal; (3) it was foreseeable that the individuals named in the proposal would not be available to perform the contract work; and (4) personnel other than those proposed are performing the services.

Unified Architecture & Eng'g, Inc. v. United States, 46 Fed. Cl. 56, 64 (2000), aff'd, 251 F.3d 170 (2001) (per curiam); see also Orion Int'l Techs. v. United States, 66 Fed. Cl. 569, 573 n.5 (2005); Consol. Eng'g Servs., Inc. v. United States, 64 Fed. Cl. 617, 632-33 (2005); OAO Corp. v. United States, 49 Fed. Cl. 478, 481 (2001).

Plaintiff only seeks a preliminary injunction with respect to the Vulnerability Assessment Manager and Site Safeguards and Security Plan Manager positions. Tr. II at 73-74. Thus, the court's analysis is limited to whether PAI Corporation effected a bait and switch with respect to those two positions. PAI Corporation clearly represented that it would deliver Mr. Weatherby as the Vulnerability Assessment Manager and Mr. McKnight as the Site Safeguards and Security Plan Manager. The NNSA clearly relied on PAI Corporation's representations concerning Mr. Weatherby and Mr. McKnight's assumption of these two positions. However, contrary to plaintiff's allegation that PAI Corporation did not deliver Mr. Weatherby and Mr. McKnight, the evidence before the court demonstrates that Mr. Weatherby and Mr. McKnight are performing as Vulnerability Assessment Manager and Site Safeguards and Security Plan Manager, respectively. Thus, plaintiff failed to prove that a bait and switch occurred. Furthermore, with respect to a bait and switch allegation, personnel, not location, is the central issue. The location where certain Key Personnel perform their duties is irrelevant–that is a matter of contract administration. Rather, the focus of the court's inquiry is whether Mr. Weatherby and Mr. McKnight, the two individuals identified in PAI Corporation's Competitive Proposal, are serving in the capacities for which they were offered.

Because Mr. Weatherby and Mr. McKnight are serving in their capacities as proposed by PAI Corporation, plaintiff cannot show the third or the fourth element of a bait and switch claim with respect to the Vulnerability Assessment Manager and Site Safeguards and Security Plan Manager positions. Accordingly, based upon the current record, plaintiff has not shown that it is likely to succeed on the merits. Even though the court's determination on this factor is dispositive of plaintiff's motion, it will examine, for the benefit of the parties, the remaining three elements of a claim for preliminary injunctive relief.

### C. Plaintiff Has Not Shown Irreparable Injury

Plaintiff contends that it would be irreparably harmed if preliminary injunctive relief is not granted because it would not be eligible to "compete for any continuation of these Security Support Services until December 2011, when the Contract . . . expires by its terms. Such a lost opportunity to compete, and the competitive advantage which will accrue to PAI through performing the Contract . . . is sufficient." Pl.'s Mot. 7 (citing PGBA, LLC v. United States, 57 Fed. Cl. 655, 664 (2003) ("This court has acknowledged that a lost opportunity to compete may constitute an irreparable harm . . . .")). Defendant argues that PGBA, LLC is distinguishable from the case at bar for two reasons. First, defendant notes, PGBA, LLC concerned an agency's override of an automatic stay imposed by the Competition in Contracting Act of 1984, and in its override memorandum, as it was permitted to do, the agency indicated that it would continue the contract even if the Government Accountability Office sustained the protest. Def.'s Br. 15-16. Second, in PGBA, LLC, the protestor was the incumbent contractor and the successful bidder had not begun to perform substantially under the contract. Id. at 16. Because of these two differences, defendant urges the court not to adopt the reasoning of PGBA, LLC. Id. at 15-16.

The court agrees with defendant that PGBA, LLC is distinguishable from this case. However, the court notes that lost competitive advantage is a valid injury. That said, it is not an injury that provides, standing alone, a compelling justification for a preliminary injunction in this case.

### D. The Balance of Hardships Tips in Favor of Defendant

The court also must weigh the detrimental effects to plaintiff of not issuing a preliminary injunction with any harms that defendant might suffer if it awards such injunctive relief. The paramount hardship facing defendant is the potential disruption to national security. In other words, the court must determine whether national security may be compromised if the court awards injunctive relief.

In considering a bid protest, the court is required to "give due regard to the interests of national defense and national security . . . ." 28 U.S.C. § 1491(b)(3). The Federal Circuit has addressed this provision of the Tucker Act on only one occasion, when it remarked that "section 1491(b)(3) merely instructs courts to give due regard to the issue of national defense and national security in shaping relief." PGBA, LLC, 389 F.3d at 1226; accord OTI Am., Inc. v. United States, 68 Fed. Cl. 646, 659 (2005) ("[W]hile this national security interest may affect the type of injunctive relief the court may grant, it does not necessarily forestall the issuance of any and all forms of such relief."); Filtration Dev. Co. v. United States, 60 Fed. Cl. 371, 385-88 (2004) (granting limited injunctive relief in light of national defense considerations). On the other hand, section 1491(b)(3) has been addressed in many cases before the Court of Federal Claims. This court agrees with the following assessment:

> The Tucker Act requires that the Court consider the interest of national defense in its bid protest decisions. . . . Nonetheless, "claims of national security . . . are often advanced by the Government in challenges to procurement decisions. The

> Court will not blindly accede to such claims but is bound to give them the most careful consideration." . . . While the Court certainly must give serious consideration to national defense concerns and arguably should err on the side of caution when such vital interests are at stake, allegations involving national security must be evaluated with the same analytical rigor as other allegations of potential harm to parties or to the public.

Gentex Corp. v. United States, 58 Fed. Cl. 634, 655 (2003) (citations omitted).

Plaintiff asserts that "day-to-day Security Support Services are currently being provided by the large business security support services Contractor for the Nevada Test Site," and that "immediate requirements for Security Support Services at the Nevada Site Office and at the Nevada Test Site have already been satisfied . . . ." Pl.'s Mot. 6. Further, Mr. Hedman testified that plaintiff could transition into the contract within a week. Tr. II at 16-17, 20. On the other hand, defendant contends that a preliminary injunction will cause a major disruption of the operations of the Nevada Test Site. Def.'s Br. 17-19.

The court found the declaration and testimony of Ms. Bodin to be especially helpful and informative in its balance of hardships analysis. In particular, Ms. Bodin's testimony was critical in explaining how and why the various security functions at the Nevada Test Site and Nevada Site Office would be shut down. Importantly, plaintiff did not challenge Ms. Bodin's testimony regarding the national security implications of a preliminary injunction on cross-examination. See Tr. II at 71 (confirming that the NNSA would lose its ability to conduct new initiatives including special nuclear material if a preliminary injunction were awarded). There is no doubt that the balance of hardships weighs in favor of defendant.

### E. The Public Interest Would Not Be Served by a Preliminary Injunction

Plaintiff asserts that the public interest would be served with an award of preliminary injunctive relief because such relief would preserve the integrity of the competitive process. Pl.'s Mot. 6 (citing Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705, 716 (2006)). With respect to the Vulnerability Assessment Manager and Site Safeguards and Security Plan Manager positions, the only two positions at issue at this time, plaintiff has not shown that PAI Corporation besmirched the competitive process. Contrary to plaintiff's allegations, PAI Corporation delivered the two managers named in its Competitive Proposal, as promised. Furthermore, it would be in the public interest to permit the ongoing performance of the contract by PAI Corporation as the nation's security could be compromised if PAI Corporation's performance was enjoined.

## IV. CONCLUSION

Plaintiff has not shown that it is likely to succeed on the merits, that the balance of hardships weigh in its favor, or that the public interest would be served by the court's issuance of a preliminary injunction. Accordingly, it is **ORDERED** that:

1. Plaintiff's motion for a preliminary injunction is **DENIED**.

2. Defendant's motion to strike plaintiff's exhibits 1, 2, 11, 12, 15, 16, 17, 18, 19, and 20 in their entirety is **GRANTED**.

3. Defendant's motion for reconsideration is **DENIED AS MOOT**.

4. The court has issued this opinion under seal in accordance with the court's Protective Order. The parties are directed to file any proposed redactions to this opinion by **no later than Friday, March 30, 2007**.

5. The parties shall file, by **no later than Friday, March 30, 2007**, a joint status report containing a proposed schedule for further proceedings.

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge